**In the Matter of TOWNVIEW NURSING HOME, Debtor.**

**TOWNVIEW NURSING HOME—DEBTOR-IN-POSSESSION, Plaintiff,**

v.

**The STATE OF NEW YORK and the City of New York, Human Resources Administration, Defendants.**

**The STATE OF NEW YORK, Third Party Plaintiff,**

v.

**Morris GOLDSMITH, Jean Melnick Sternberg, Lucille Feldman Neis and Estate of Robert Mancus with Bess Mancus as Executrix thereof, individually and as partners doing business as Townview Nursing Home, Defendants.**

Bankruptcy No. 75 B 1578 (JL).

United States Bankruptcy Court, S.D. New York.

Feb. 25, 1983.

Charles J. Hynes, Deputy Atty. Gen., New York City, for State of N.Y.; Mary Ellen Bliss, Sp. Asst. Atty. Gen., New York City, of counsel.

Pinks, Feldman & Brooks, Melville, N.Y., for Townview Nursing Home; Steven G. Pinks, Melville, N.Y., of counsel.

## OPINION

JOEL LEWITTES, Bankruptcy Judge.

In February of 1977, Townview Nursing Home ("Townview" or "the Debtor") instituted this adversary proceeding against the City of New York ("The City"). In its complaint, Townview alleged that it had filed a petition, in this Court, to effect an arrangement pursuant to the provisions of Chapter XI of the Bankruptcy Act of 1898, since repealed, on September 9, 1975. Subsequent to the filing of its petition, alleged Townview, it provided an extended care facility (nursing home) to numerous recipients of public assistance. During the period September 9, 1975 to December 31, 1975,

Townview alleged that it had rendered services to nursing home patients, at the City's request and for the account of the City. Townview also alleged that it billed the City for these services in the sum of $230,505.39 and received $122,600.00, leaving a balance due of $107,905.39. Although Townview, allegedly, timely demanded the latter amount, no payment had been made as of the filing of its complaint.

The City responded, on March 28, 1977, by a Motion to Abstain. In an accompanying affidavit, the City alleged that this Court was without jurisdiction to hear Townview's complaint. In support of this allegation, the City described for this Court the procedure involved in paying nursing homes for services rendered to recipients of public assistance.

Townview, this Court was told, participated in the Federal Medicaid program. 42 U.S.C. Sec. 1396, et seq., (1976). Section 1396 of the Medicaid Act authorizes appropriations to be made for each fiscal year. The sums appropriated under this section are made payable to States whose plans for medical assistance have been submitted and approved by the Secretary of Health and Human Services (formerly, Secretary of Health, Education and Welfare). Section 1396a establishes the parameters for such plans. Under that section, it is clear that procedure and methods for reimbursement are a State's responsibility. *See, Rhode Island Hospital v. Califano,* 447 F.Supp. 703, 710 (D.R.I.1978).

The State of New York moves this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Bankruptcy Rule 756, 411 U.S. 1084, as to its first coun-terclaim-cause of action. Its motion would require this Court to determine the correctness of four audit reports, covering the years 1970, 1971, 1972 and 1973. In large part, we grant the State of New York's motion for summary judgment, but we also deny the motion as to several audit items.

Article 28 of the New York Public Health Law established the procedures and methods for reimbursement to eligible facilities providing care to Medicaid recipients. New York Public Health Law Section 2807 (McKinney's 1982). Rates of reimbursement, in New York, are promulgated on a prospective basis. Per diem rates of care for nursing homes are set by the Department of Health based upon financial reports submitted by a medical facility, such as Townview. 42 U.S.C. Sec. 1396a(a)(30); New York Social Services Law Sec. 363, et seq. (McKinney's 1982); New York Public Health Law Secs. 2805, 2807 (McKinney's 1982); 10 N.Y.C.R.R. Sec. 86 (repealer effective September 30, 1976).[1] The allowable costs of a base year are adjusted to take into account inflationary factors and applied to a rate year, two years subsequent to the base year, subject to field audit of the books and records of a facility. Actual payment of Medicaid funds, which consist partially of federal and partially of state monies, is made by a Social Service District of the City, after computation and approval of the rate of reimbursement by the Department of Health, a State agency. Where the result of an audit is retroactively to increase the reimbursement rate, the City pays the additional funds to the facility. Where the result is a decrease in the rate, the City recovers the funds. If a facility questions the result of a field audit,

1. The Department of Health promulgates regulations under New York Public Health Law Sec. 2800, et seq. (McKinney's 1982). In 1976, it repealed Section 86, the section applicable here, and replaced it with Section 86–1 and 86–2, and other subparts. New Section 86–1 deals with medical facilities, a term which prior to 1976 included nursing homes, but which presently excludes these homes from its application. Section 86–2 covers residential health care facilities, a term defined in New York's Public Health Law to include nursing homes and health-related facilities. We apply old Sec-tion 86 since regulations governing reimbursement rates should not be applied retroactively. *Solnick v. Whalen,* 63 App.Div.2d 1062, 405 N.Y.S.2d 1003 (1978).

Unfortunately, these regulations, reported in a loose leaf binder, do not appear in books available to this Court. Apparently, repealed regulations are discarded and only their replacement provisions appear within such books. We worked from these replacement regulations and historical notes appended to them.

it must request and participate in an administrative hearing.

In an affidavit in support of its Motion to Abstain, the City alleged that Townview had been audited and that the audit disclosed an overpayment to Townview equal to $348,886.00. Since the City would seek reimbursement of this amount, making Townview's claim against the City only a partial offset against this over-payment, and because Townview likely would question the result of this audit and, in order to question the audit, Townview would be required to participate in an administrative hearing, the City concluded that this Court was without jurisdiction to adjudicate Townview's claim against the City. This Court never decided the City's motion.

On August 10, 1978, the City brought an order to show cause why the State of New York should not be joined as an indispensible party pursuant to Federal Rule of Civil Procedure 21 and Bankruptcy Rule 721. The order to show cause also was not decided by this Court, for, in August of 1978, the State of New York ("New York" or "the State") consented to joinder.

On September 28, 1978, the State answered Townview's complaint, raising three affirmative defenses. As a first affirmative defense, New York contended that this Court was without subject matter jurisdiction, alleging that its state agencies have exclusive jurisdiction to determine Medicaid reimbursements. It next raised the Eleventh Amendment as an affirmative defense. Finally, the State contended that it had filed a proof of claim on November 10, 1977 in an amount equal to $340,000.00, based upon overpayments it had made to Townview between July 1, 1971 and December 18, 1975. Townview's complaint amounted to nothing more than an objection to this proof of claim, argued New York, and so should be dismissed.

New York also raised eight counterclaims to Townview's complaint. Moreover, each counterclaim represented a cause of action in the Third-Party complaint New York brought at the same time. Each counterclaim-cause of action prayed for judgment in an amount equal to $348,886.00, based upon its retroactively decreased rate reimbursements engendered by the audit it had performed. Each counterclaim-cause of action rests upon different legal theories.

The first apparently rests upon the State's statutory and regulatory authority retroactively to alter the reimbursement rate as applied to Townview. The State rests, in its second counterclaim-cause of action, upon a theory of "money had and received." The third counterclaim-cause of action alleges a "continuing fraudulent scheme to wrongfully obtain Medicaid reimbursement payments in excess of what they would otherwise have been entitled to obtain." Counterclaim and Third-Party complaint at 10. In its fourth counterclaim and cause of action, New York contends that it has a provable, allowable but non-dischargeable claim against Townview, pursuant to Section 17a, 11 U.S.C. Sec. 35a (repealed). The fifth counterclaim-cause of action contends that money was obtained from the State through negligently, carelessly and recklessly prepared financial reports. The sixth rests upon a theory of conversion of public funds. As a seventh theory, the State alleges that the Third-Party defendants' acts and practices amounted to a breach of fiduciary duty owed to New York. Finally, the State contends that these same acts constitute material breaches of contract, of which New York was a third party beneficiary.

On June 30, 1980, New York moved this Court for summary judgment[2] pursuant to Federal Rule of Civil Procedure 56, made

**2.** While the State drafted its counterclaim and Third-Party complaint to include eight counterclaim-causes of action, its motion for summary judgment is not, by its terms, limited to any one legal theory. However, affidavits and memoranda only address the first counterclaim-cause of action. So as not to prejudice the State in pursuing its other seven bases for liability, this Court treats New York's motion as one for partial summary judgment as to its first counterclaim-cause of action. Since Townview assumed this same limitation, arguing only with respect to the State's first counterclaim-cause of action, our treatment also should not prejudice Townview.

applicable to adversary proceedings in this bankruptcy forum through Bankruptcy Rule 756, 411 U.S. 1084 (1973). Townview opposes New York's motion but brings no cross-motion for summary judgment.[3]

### FACTS

Townview participated in New York's Medicaid program, until December of 1975, when it ceased doing business as a nursing home. It billed the New York City Department of Social Services for services rendered to Medicaid patients for the period July 1, 1971 through December 31, 1975 and was paid according to rates established from annual cost reports submitted by Townview to the New York Department of Health in 1970, 1971, 1972 and 1973.

Medical facilities (a term which, prior to September 30, 1976, included nursing homes) 10 N.Y.C.R.R., Section 86.1 (repealed), by regulation, 10 N.Y.C.R.R. Section 86.3 (repealed), are required to file with New York's Department of Health an annual cost report, known as an HE–2P Report. The Health Department uses information on the HE–2P Report to establish Medicaid per diem rates for a given period. 10 N.Y.C.R.R. Sections 86.2, 86.10.-20 (repealed). Medical facilities then bill the appropriate Social Services District for services rendered to Medicaid patients and are paid at the rate established by the Health Department.

Reimbursement rates established by the Department of Health are provisional and subject to alteration following audit of a medical facilities' records and reports. 10 N.Y.C.R.R. Section 86.8 (repealed). If the audit reveals that costs were incorrectly stated in an HE–2P Report, then the Medicaid rate derived from that report is revised to reflect the audit findings. 10 N.Y.C.R.R. Sec. 86.8(a) (repealed). The Health Department then applies the revised rate to the facility's billings in order to determine the amount of overpayments received as a result of the incorrect statements.

The Health Department notifies the medical facility of its audit adjustments and of the revised rates. 10 N.Y.C.R.R. Sec. 86.8(e) (repealed). The facility has thirty days from the receipt of the audit report within which to appeal audit adjustments. If timely appeal is not made, the audit adjustments become final. 10 N.Y.C.R.R. Sec. 86.8(e) (repealed). Where appeal is timely, the Health Department conducts a "bureau review" of the appealed adjustments, 10 N.Y.C.R.R. Sec. 86.8(f)(1) (repealed), and, upon further protest, offers a formal hearing, concluding in a final decision on the matter.

Final audit adjustments entitle the Department of Health to retroactively adjust the provisional rate already paid to a medical facility, or prospectively to adjust the facility's current certified rate. 10 N.Y.C.R.R. Sec. 86.8(g). This decision is within the discretion of the State Commissioner of Health.

In 1975, shortly before Townview closed, the Department of Health audited Townview's books and records for the years 1970 through 1973 and determined that Townview had misstated costs in HE–2P Reports filed for those years. It recalculated Townview's reimbursement rates on the basis of its audit findings, applied the revised rates to Townview's billings and determined that it paid Townview $348,886.00 in excess of what it would have paid the facility had the 1970–1973 HE–2P Reports stated costs completely and accurately.

The Department formally notified Townview of the audit results, in March of 1977, sending copies of each of the audit reports. *See* Exhibits A–D appended to Affidavit in Support of Motion for Summary Judgment. Also sent at that time were the recalculated rates for each rate period affected by the audit and a cover letter informing Townview that the new rates would become final unless it appealed within thirty days. *See* Exhibits F and G appended to Affidavit in Support of Motion for Summary Judgment.

---

**3.** Because Townview brings no cross-motion for summary judgment, its initial complaint and the State's affirmative defense are not properly before this Court. We, therefore, withhold decision on this matter providing a proper motion.

Townview appealed many of the audit adjustments within the thirty-day time limit. *See* Exhibits H and I appended to Affidavit in Support of Motion for Summary Judgment. Fifty-four audit adjustments were not appealed within that period, however. *See* Exhibit J appended to Affidavit in Support of Motion for Summary Judgment.

## DISCUSSION

### 1. *Matters of Threshold Concern*

#### a. *Subject Matter Jurisdiction*

This Court raised the issue of subject matter jurisdiction as it pertains to 42 U.S.C. Sec. 405(h) (1982).[4] We did so after considering *In the Matter of Clawson Medical Rehabilitation and Pain Care Center (Andrews v. Blue Cross and Blue Shield of Michigan),* 12 B.R. 647 (Bkrtcy.E.D.Mich. 1981). The District Court, in *Clawson Medical,* reversed a bankruptcy court's limitation of retroactive reimbursement rate alterations applied to a debtor-in-possession by Health and Human Service's intermediary, Blue Cross and Blue Shield of Michigan. It held that Sec. 405(h) placed exclusive jurisdiction for reimbursement rate alterations in agency hands and that a bankruptcy court acted without jurisdiction when it limited such alterations, absent exhaustion of administrative remedies. Supplemental memoranda of law were submitted by the parties, as requested by this Court.

We find Section 405(h) to be inapplicable, however, when considering changes in reimbursement rates under the Medicaid program, the relevant statute here. Section 405 appears within Subchapter I of Title 42, Grants to States for Old-Age Assistance and Medical Assistance for Aged. Through 42 U.S.C. Sec. 1395ii, Sec. 405(h) is made applicable to 42 U.S.C. Sections 1395, et seq., (1982), Health Insurance for Aged and Disabled, the Medicare program. Similarly, Section 405(h) is made applicable to 42 U.S.C. Sections 1381, et seq., (1982), Supplemental Security Income for Aged, Blind and Disabled, pursuant to 42 U.S.C. Section 1383(c)(3) (1982).

No similar statute, however, makes Section 405(h) applicable to the Medicaid program. The only reference to procedural matters within 42 U.S.C. Sections 1396, et seq., (1982) is Section 1396a(a)(3), requiring a State plan for medical assistance to "provide for granting an opportunity for a fair hearing before the State agency" in the appropriate circumstances.

#### b. *Primary Jurisdiction*

An issue remains as to whether this Court,[5] in its discretion, should retain jurisdiction[6] and reach the merits of reimbursement rates applied against Townview. We find the doctrine of primary jurisdiction inapplicable as to the State's first counterclaim-cause of action; the State's seven other counterclaim-causes of action are not properly before this Court and we do not express an opinion whether primary jurisdiction over them rests in a State adminis-

---

4. Section 405(h) provides, in pertinent part: "The findings and decisions of the Secretary (pursuant to Section 405(g)) after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or government agency..."

5. New York raised the issue of primary jurisdiction as its first affirmative defense to Townview's complaint. Since Townview brings no cross-motion for summary judgment, that complaint and the State's affirmative defenses are not properly before this Court. We raise the issue of primary jurisdiction, *sua sponte.*

6. Neither the doctrines of primary jurisdiction nor exhaustion of remedies ousts a court of jurisdiction. Both instead only postpone the exercise of it. *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (primary jurisdiction); *Mercury Motor Exp., Inc. v. Brinke,* 475 F.2d 1086, *appeal after remand,* 494 F.2d 39 (5th Cir.1973) (primary jurisdiction); *Hayes v. Secretary of Defense,* 515 F.2d 668 (D.C.Cir.1975) (exhaustion of remedies); *Kale v. United States,* 489 F.2d 449 (9th Cir.), *cert. denied,* 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220 (1973) (exhaustion of remedies); *Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926 (10th Cir.1975).

trative agency. *Compare In Re Neavear,* 6 Collier Bankr.Cas.2d 367, 674 F.2d 1201 (7th Cir.1982); *In the Matter of Hawley,* 9 Bankr.Court Dec. 921, 23 B.R. 236 (Bkrtcy. E.D.Mich.1982) (BNA); *In re Rowan,* 5 Collier Bankr.Cas.2d 1008, 15 B.R. 834 (Bkrtcy. N.D.Ohio 1981). The doctrine of primary jurisdiction:

> "determines whether the federal court will refrain from exercising its unquestioned jurisdiction over a dispute until after an administrative agency has resolved some question arising in the proceedings before the court."

*In ICC v. All-American, Inc.,* 505 F.2d 1360, 1362 (7th Cir.1974), we are told that:

> "the rationale of the doctrine of primary jurisdiction is not concern for specific litigants but, rather, the notion that the agencies, with their special expertise, should have the initial opportunity to develop and administer their policies consistently. *See* Davis, Administrative Law Treatise, Section 19.01 (1958)."

*U.S. Tour Operators Association v. Trans World Airlines,* 556 F.2d 126, 130 (2d Cir. 1977). Moreover, the doctrine of primary jurisdiction applies in bankruptcy proceedings. The Supreme Court repeatedly holds that:

> "... the bankruptcy court normally should stay its hand pending an administrative decision." *Nathanson v. Labor Board,* 344 U.S. 25, 30, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952). *Accord Smith v. Hoboken R. Co.,* 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946); *Thompson v. Texas M.R. Co.,* 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946).

In determining the doctrine's applicability to a particular dispute,

> "(t)he question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application." *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64–65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). *Accord Board of Education of the City School District of the City of New York v. Harris,* 622 F.2d 599 (2d Cir.1979); *U.S. Tour Operators Association v. Trans World Airlines, supra,* 556 F.2d at 130; *Danna v. Air France,* 463 F.2d 407, 412 (2d Cir.1972).

Application of the primary jurisdiction doctrine in this proceeding would not, we think, serve its purpose. While New York Public Health Law Sections 2800, 2807(2) and (3) identify the Department of Health as possessing special expertise in determining reimbursement rates for the Medicaid and other federally assisted public health programs, and 10 N.Y.C.R.R. Sec. 86.8 (repealed) establishes the procedure for administrative review of audits performed by the Department of Health, New York state courts do not require these administrative remedies to be exhausted where the action is brought by the State Attorney General pursuant to New York Executive Law Sec. 63–c (McKinney's 1982).[7] *Compare State of New York v. Olinville Nursing Home, slip op.* 41197/78 (1979) (Exhibit A appended to New York's Supplemental Memorandum of Law); *State of New York v. Kirstein, slip op.* 11949/78 and 15202/78 (1979) (Exhibit B appended to New York's

---

**7.** New York Executive Law Sec. 63–c (McKinney's 1982) provides as follows:

"1. Where any money, funds, credits, or other property held or owned by the state ... has heretofore been ... without right obtained, received, converted, or disposed of, an action to recover the same, or to recover damages or other compensation for so obtaining, receiving, paying, converting or disposing of the same, or both, may be maintained by the state ... *although a right of action for the same cause exists by law in some other public authority,* and whether an action therefore in favor of the latter is or is not pending when the action in favor of the

state is commenced. The Attorney General shall commence an action, suit or other judicial proceeding, as prescribed in this section, whenever he deems it for the interests of the state so to do; or whenever he is so directed, in writing, by the governor." (Emphasis supplied).

Under subdivision 2 of the statute, at least until final judgment, title to the fund is vested in the State and not in the agency or subdivision of the State to which it previously belonged.

New York makes no mention of Section 63–c in its first counterclaim-cause of action. This defect in pleading can easily be remedied, however.

Supplemental Memorandum of Law) *with* *Caldwell v. Commissioner of Health,* 47 App.Div.2d 689, 364 N.Y.S.2d 573 (1975).

### c. Statute of Limitations

■ The parties agree that a six-year statute of limitations applies in this proceeding; they disagree, however, as to when that statute began to toll. Townview argues that the statutory period began to run at the time money changed hands between itself and the relevant regulatory agency. *See* Memorandum of Law in Opposition to Motion for Summary Judgment at 4–5. New York, instead, contends that the statute did not begin to run until Townview received notice of its audit results on March 21, 1977. *See* Reply Memorandum of Law at 2–9.

We agree with New York that the statutory period did not begin to run until its audit was complete.[8] "Prior to the time of the audit, neither party had a cause of action against the other." *United States v. Withrow,* 593 F.2d 802, 804 (7th Cir.1979). *See* 10 N.Y.C.R.R. Sec. 86.8 (repealed). It seems clear to this Court that:

"... where, by contract or by statute, the State's obligation to pay is conditioned by an audit, no suit can be brought by a claimant until the official charged with making the audit has done so and has formally rejected all or some part of the claim."

*City of New York v. State of New York,* 40 N.Y.2d 659, 668, 389 N.Y.S.2d 332, 357 N.E.2d 988 (1976). 10 N.Y.C.R.R. Sec. 86.-8(a) (repealed) states that reimbursement rates "shall be construed to represent a provisional rate until such audit is performed and completed."

### d. Burden of Proof

New York brings this motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. As the moving party, it bears the burden of proving that "there is no genuine issue as to any material fact and that (it) is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). Because the burden is on the movant, evidence is construed in favor of the opposing party, Townview, in this proceeding. *Adickes v. S.H. Kress & Co., supra,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142.

Where a moving party meets this burden, however, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Federal Rule of Civil Procedure 56(e).

"The non-movant has (an) affirmative duty to come forward to meet a properly supported motion for summary judgment: 'A party opposing a motion for summary judgment cannot make a secret of his evidence until trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to "smoke out" the facts so that the judge can decide if anything remains to be tried.' "

*United States v. Kenealy,* 646 F.2d 699, 706 (1st Cir.1981), *quoting Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972). *Accord Pico v. Board of Education, Island Trees Union Free School,* 638 F.2d 404, 431, n. 9 (2d Cir.1980) ("the party opposing the motion must set forth 'concrete particulars' ... It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion"); *SEC v. Research Automation Corp.,* 585 F.2d 31 (2d Cir.1978); *Applegate v. Top Associates, Inc.,* 425 F.2d 92 (2d Cir.1970).

■ The burdens applied in a motion for summary judgment should be distinguished

---

8. Both New York and Townview contend that the six-year statute of limitation applies because this proceeding is, in essence, one for "money had and received." We do not find that New York's first counterclaim-cause of action properly raises a claim for "money had and received," especially since its second counterclaim-cause of action expressly asserts this legal theory of recovery.

from those applicable to objections to proofs of claim in a bankruptcy setting. Bankruptcy Rule 301(b) and Sec. 57a, 11 U.S.C. Sec. 93a (repealed), ensure that a proof of claim, properly filed, constitutes "prima facie evidence of the validity and amount of the claim." *Whitney v. Dresser,* 200 U.S. 532, 26 S.Ct. 316, 50 L.Ed. 584 (1906). The effect of Sec. 57a and Bankr.Rule 301(b) is to place upon the objectant the burden of going forward with substantial evidence to rebut the prima facie validity of a claim. *In the matter of Interstate Magazine Hauling Corp.,* 55 F.Supp. 880 (S.D.N.Y.1943); *In re Falk,* 83 F.Supp. 817 (S.D.N.Y.1949); *In re Busman,* 5 B.R. 332 (Bkrtcy.S.D.N.Y. 1980). But, this burden of going forward should not be confused with a claimant's ultimate burden of proof. *Whitney v. Dresser, supra,* 200 U.S. at 534–5, 26 S.Ct. at 317.

We also note that 10 N.Y.C.R.R. Sec. 86.8(f)(3) (repealed) is relevant to the allocation of the burden of proof in this proceeding, for it provides that:

"(An) audit report shall be presumptive evidence of its content. The burden of proof at any such hearing shall be upon the medical facility to prove by *substantial evidence*[9] that the items therein contained are incorrect."

■ These statutes, rules, regulations and case law interpreting them are not inconsistent, however. For under Bankruptcy Rule 301(b), Sec. 57a and 10 N.Y.C.R.R. Sec. 86(e), New York's audit results, and the proof of claim it filed in reliance upon the results of that audit, presumptively are valid. Townview can challenge the method and results of the audit, but only with "substantial evidence" negating the audit's correctness. New York meets its burden of proving that there is no material issue of genuine fact when it presents to this Court the results of its audit; the burden then shifts to Townview to set forth

specific facts showing that there is a genuine issue for trial.

2. *The Audit Results*

 a. *The Thirty Day Rule—Those Audits Results Not Questioned Within Thirty Days of Receipt of Notice*

10 N.Y.C.R.R. Sec. 86.8 (repealed) provides as follows:

"The audit report shall be final unless within 30 days of receipt of the audit report, the medical facility initiates a bureau review of such final audit report by notifying the Division of Health Care Financing by registered or certified mail, detailing the specific items of the audit report with which the provider disagrees, and such other material as the provider wishes to submit in its behalf, and forwarding all material documentation in support of the medical facility's position."

The parties agree that the State sent and Townview received the audit report as well as recalculated reimbursement rates and a cover letter notifying Townview of the time within which it must respond to both. They also agree that Townview appealed many of the audit results within this time limit, but that 54 items were uncontested within the regulatory period. Not until Townview's Memorandum in Opposition to the motion for summary judgment did Townview object to these 54 items.

New York argues that the doctrine of collateral estoppel works to preclude our consideration of Townview's objections to these 54 previously uncontested items. Townview argues that our application of the 30-day rule would deny its "absolute entitle(ment) to a hearing for the purpose of challenging the determination made by an audit which results in a claim for repayment and reduction of rates," a right which it argues it is entitled to under both New York and federal bankruptcy law. In the

---

**9.** "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Consolo v. Federal Maritime Comm'n.,* 383 U.S. 607, 619–620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1956); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477–487, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)." *Nasser v. Secretary of Health, Education & Welfare,* 388 F.Supp. 58, 62 (E.D.N.Y.1975).

alternative, Townview contends that Sections 11, 311 and 314 of the Bankruptcy Act of 1898, 11 U.S.C. Sections 29, 711 and 714 (repealed), as well as Bankruptcy Rule 11–44, 415 U.S. 1033 (1974), the Bankruptcy Act's automatic stay provisions, "relieved (the debtor) from making objections to the audit require(d) by state regulation or otherwise, to institute an Article 78 proceeding within any State court, and to comply with any other judicial, quasi-judicial or administrative procedures or any proceedings taken outside this Court, to declare the audit unjustified." Memorandum of Law in Opposition to the motion for summary judgment at 6.

(i) *Collateral Estoppel or Res Judicata*

As the Supreme Court stated, in *Montana v. United States,* 440 U.S. 147, 153–4, 99 S.Ct. 970, 973–4, 59 L.Ed.2d 210 (1978): "(a) fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact *distinctly put in issue and directly determined by a court of competent jurisdiction* ... cannot be disputed in a subsequent suit between the same parties or their privies...' Under res judicata, a *final judgment on the merits* bars further claims by parties or their privies based on the same cause of action. Under collateral estoppel, once an issue is *actually and necessarily determined by a court of competent jurisdiction,* that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation... To preclude parties from contesting matters that they have had a *full and fair opportunity to litigate* protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decision." (citations omitted) (emphasis added).

The issue in this proceeding, thus, is whether Townview had, in its administrative setting, "a full and fair opportunity to litigate" the audit results, even though, by failing timely to object to 54 of the audit results, the audit may be final as against Townview. 10 N.Y.C.R.R. Sec. 86.8(e) (repealed).

This Court finds that Townview had, at least, the *opportunity* [10] for full and fair litigation. For 10 N.Y.C.R.R. Sec. 86.8(f)(4) (repealed) incorporates New York Public Health Law Sec. 12–a(6) (McKinney's 1982), the provision which establishes the notice requirements of and procedural entitlements in formal hearings before the Department of Health. That section provides that:

"At a hearing, the respondent may appear personally, shall have the right to counsel, and may cross-examine witnesses against him and produce evidence and witnesses in his behalf."

The Supreme Court approved, as constitutional, collateral estoppel of issues actually litigated in an administrative setting which provided an adversary proceeding with testimony, cross-examination, exhibits, briefs and argument. *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). *See Painters District Council No. 38 v. Edgewood Contracting Co.,* 416 F.2d 1081, 1084 (5th Cir.1969); *Nasem v. Brown,* 595 F.2d 801, 807 (D.C.Cir.1979).

The 30-day rule, as found in 10 N.Y.C.R.R. Sec. 86.8(e) (repealed) is, however, in the nature of a default judgment. The doctrines of collateral estoppel and res judicata differ as to whether they preclude later litigation of the subject of a default judgment; the doctrine of res judicata prevents reconsideration of a cause of action previously the subject of a default judgment, while the doctrine of collateral estoppel attaches no significance to a prior de-

---

**10.** We find no merit to Townview's contention that it has an *absolute* right to a hearing. To be sure, the cases it cites in support of this argument provide that Townview has a right to be heard where reimbursement rates are altered retroactively. But this could not mean that Townview has a right to a hearing, despite default or where no genuine issues of fact exist.

fault judgment, at least in this District. *Super Star Sneakers & Sports, Inc. v. Bata Shoe Co., Inc.,* 508 F.Supp. 260 (S.D.N.Y. 1981). *Accord In the Matter of McMillan,* 579 F.2d 289 (3d Cir.1978). *Compare Fairchild, Arabatzis & Smith, Inc. v. Prometco Co., Ltd.,* 470 F.Supp. 610, 617 (S.D.N.Y. 1979) (under New York state law, default judgment entitled to collateral estoppel effect). We need not decide whether this proceeding implicates the doctrine of res judicata or collateral estoppel,[11] for, as the court in *United States v. Martin,* 395 F.Supp. 954 (S.D.N.Y.1975) stated:

> "(r)esolution of the present controversy is not likely to be advanced, however, by contrasting labels of res judicata and collateral estoppel on the same and different causes of action. Fairly stated, the essential question becomes whether the claims asserted by the government in the present and prior actions are closely enough related to justify the conclusion that the defendant should have foreseen the consequences in the present action of his failure to litigate his defenses in the prior action. *See* 1B Moore's Federal Practice, Para. 0.444(2) at 4005 (2d ed. 1982)."

Id. at 959.

To the question whether "the defendant should have foreseen the consequences in the present action of his failure to litigate his defenses in the prior action" we find, as did the court in *Martin,* that "(t)he answer is inescapably yes." Id.

Regulations promulgated by the Department of Health, 10 N.Y.C.R.R. Sec. 86.8(e) (repealed), provide that "the audit report shall be final unless within 30 days ... the medical facility initiates a bureau review." Moreover, the Department of Health sent to Townview, along with notice of its audit results and recalculated reimbursement

rates, a cover letter informing it that the new rates would become final unless appealed within 30 days. *See* Exhibit G appended to Affidavit in Support of Motion for Summary Judgment. Nor are we persuaded by Townview's argument that it relied upon the protection of the automatic stay to toll continuation of administrative proceedings instituted against it. For, whether or not the automatic stay provisions relieved Townview of the obligation to respond to the audit results within the 30 days required by regulation, the Debtor clearly did not rely upon the automatic stay's protection since it responded in large part to the State's audit results within the 30-day time period.

### (ii) *The Automatic Stay*

Townview argues that Sections 11, 311 and 314, 11 U.S.C. Sections 29, 711 and 714 (repealed), as well as Bankr. Rule 11–44, stayed continuation of "any court or other proceeding against the Debtor." New York contends that its administrative appeal process—hearings authorized pursuant to 10 N.Y.C.R.R. Sec. 86.8(f) (repealed)—do not constitute an action against the bankrupt. Moreover, argues the State, Bankr. Rule 11–44 does not expressly apply to administrative proceedings, while the new automatic stay provision, 11 U.S.C. Sec. 362(b)(4) (1978), specifically excepts actions by a governmental unit to enforce its police or regulatory power. Finally, New York urges this Court to view Townview's participation in the administrative process by responding within the regulatory time limit as to most of the audit results as a waiver by the medical facility of whatever protection Rule 11–44 otherwise afforded it as a Debtor-in-Possession under Chapter XI of the Bankruptcy Act.

---

**11.** "The essential elements of res judicata have been defined by the courts ... as identity of parties, of subject matter and of cause of action." *Liddell v. Smith,* 345 F.2d 491 (7th Cir. 1965). Whether the applicable doctrine in this case is res judicata, or collateral estoppel, depends upon (a) whether the Department of Health and New York are privies, and (b) whether a claim brought in an administrative

proceeding, in which reimbursement rates only were to be determined, and a similar claim, as well as seven additional similar claims, brought in a bankruptcy setting and authorized by a different statutory scheme (e.g., New York Exec. Law Sec. 63–c) amount to the same cause of action as comprehended by the doctrine of res judicata.

We think that the combined effect of the Department of Health's institution of an audit of Townview's books and records, its closing conference with Townview pursuant to 10 N.Y.C.R.R. Sec. 86.8(d) (repealed) and its notification of the results of the audit accompanied, as it was, by a cover letter notifying Townview that it must respond to the audit within 30 days, amount to the institution of a "proceeding against the Debtor."

 The several courts to have considered whether an administrative proceeding is stayed by Rule 11–44 held the automatic stay provision to be inapplicable given the facts involved. In the *Matter of Shippers Interstate Service, Inc.,* 618 F.2d 9, 13 (7th Cir.1980) (Rule 11–44 did not stay NLRB prosecution of unfair labor practice; any other rule "would provide an instantly available, cheap and easy sanctuary from all state regulatory enforcement proceedings' and from all federal regulatory proceedings."); *In re Bel Air Chateau Hospital, Inc. (NLRB v. Jonas),* 611 F.2d 1248, 1251 (9th Cir.1979) ("if regulatory proceedings threaten the assets of the estate, the decision to issue a stay can then be made on a discretionary basis"); *In the matter of Colonial Tavern (Colonial Tavern v. Byrne),* 420 F.Supp. 44 (D.Mass.1976); *In the Matter of Canarico Quarries, Inc.,* 466 F.Supp. 1333 (D.P.R.1979); *In re Grand Spaulding Dodge, Inc. (Dixon v. Grand Spaulding Dodge, Inc.),* 5 B.R. 481 (Bkrtcy.N.D.Ill. 1980). In only one case, *In re Hillsdale Foundry Company,* 2 Collier Bankr.Cas. 546 (Bankr.W.D.Mich.1974), has a court held Rule 11–44 applicable to state regulatory proceedings. In *Hillsdale,* the Bankruptcy Judge ruled that proceedings of the State Department of Natural Resources and the Attorney General of Michigan to enjoin the operation of the debtor's factory for failure to comply with state pollution control laws were subject to the automatic stay under Rule 11–44 and Sec. 314. *Hillsdale* has not been widely followed, however. *See Colonial Tavern, Inc. v. Byrne, supra,* 420 F.Supp. at 45; 14 Collier on Bankruptcy, Para. 11–44.02(2) at 11–44–13 (14th Ed.1976).

Each of these cases is distinguishable from the situation present here.[12] *Shippers Interstate Service, Bel Air Chateau and Grand Spaulding Dodge* rest on the proposition that Rule 11–44's aegis does not extend beyond a Bankruptcy Court's limited, summary jurisdiction. 11 U.S.C. Sec. 711 (repealed). *Mid-Jersey National Bank v. Fidelity Mortgage Investors,* 518 F.2d 640 (3d Cir.1975) (Rule 11–44 extends only to proceedings which could divest the Debtor of property over which the Chapter XI court has jurisdiction); *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir.1976) (citing *Mid-Jersey* with approval); *United States v. Mansion House Center N. Redev.,* 594 F.2d 653, 656 (8th Cir.1979); *In the matter of Cuba Elec. & Furniture Corp.,* 430 F.Supp. 689, 691 (D.P. R.1977); *In the matter of Canarico Quarries, Inc.,* 466 F.Supp. 1333, 1339 (D.P.R. 1979). *See In re Dolly Madison Industries, Inc.,* 504 F.2d 499, 503 (3d Cir.1974). But, we have summary jurisdiction over this adversary proceeding on two grounds:[13] New York's proof of claim against the Townview

---

**12.** The Advisory Committee's Note to Bankr. Rule 11–44 provides:

"The reference to a stay of other proceedings against the Debtor is to signify the inclusion of a pending arbitration proceeding within the scope of the automatic stay."

We see no reason to view the example given— pending arbitration proceedings—to be an exclusive list of "other proceedings." If only arbitration proceedings were intended to be added, then the Committee would not have selected so broad a phrase as "or other proceeding."

**13.** Summary jurisdiction also, of course, exists over property of the estate. 10 N.Y.C.R.R. Sec. 86.8(a) (repealed) provides that any rate of payment certified prior to audit is provisional, only. In this light, we believe a cogent argument could be made that this adversary proceeding does not involve property of the estate. However, New York State law finds enough of a property interest in such payments to require post-recoupment, *Birchwood Nursing Home v. Whalen,* 70 App.Div.2d 1020, 418 N.Y.S.2d 212 (1979), but not pre-recoupment evidentiary hearings, *Clove Lakes Nursing Home v. Whalen,* 45 N.Y.2d 873, 410 N.Y.S.2d 804, 383 N.E.2d 106 (1978). We have summary jurisdiction on other grounds and need not reach this issue.

estate, *Katchen v. Landy,* 382 U.S. 323, 327, 86 S.Ct. 467, 471, 15 L.Ed.2d 391 (1966) and *United States Fidelity & Guaranty Co. v. Bray,* 225 U.S. 205, 217, 32 S.Ct. 620, 625, 56 L.Ed. 1055 (1912); and the stipulation entered into between Townview and New York, so ordered on January 11, 1979, consenting to the summary jurisdiction of this Court, 11 U.S.C. Sec. 11a(7) (repealed).

*Colonial Tavern, Grand Spaulding* and *Canarico Quarries* are also distinguishable as they rest on the proposition that a Bankruptcy Court is without jurisdiction to authorize a debtor to continue in business, even though to do so would be in violation of state or federal regulations. *See Gillis v. California,* 293 U.S. 62, 55 S.Ct. 4, 79 L.Ed. 199 (1934); *In re Dolly Madison Industries, Inc., supra,* 504 F.2d 499. In this proceeding, Townview, while a Debtor-in-Possession, no longer is in operation and has not operated since December of 1975. Nor are the regulations at issue here similar to those involved in *Colonial Tavern, Grand Spaulding* or *Canarico Quarries.* The New York public health regulations with which we are here concerned are neither continuous in nature nor so all-encompassing as the regulations in these cases. The regulations here govern billing procedures, only one aspect of a medical facility's operations. The regulation in *Colonial Tavern* involved liquor licensing requirements; in *Grand Spaulding,* they involved anti-fraud provisions applicable to automobile dealerships; and in *Canarico Quarries,* they involved environmental regulations.[14]

We decline to view a statute enacted subsequent to Rule 11–44 as persuasive in interpreting that Rule. *Broadcast Music, Inc. v. Columbia Broadcasting,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Moreover, New York may not seek refuge under the Bankruptcy Reform Act's automatic stay provision, for legislative history to Sec. 362(b)(4) states that Congress:

"... intended to give (this section) a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate."

S.Rep. No. 989, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6444. New York's administrative proceedings here amounted to a determination whether and, if so, in what amount, Townview had been overpaid by the State as a participant in the Medicaid program and, thus, may have been, actions "to protect a pecuniary interest."

The State finally urges us to view Townview's response to many of the audit results as a waiver of the protections it might otherwise have been afforded under Rule 11–44. We agree that a Debtor waives the benefit to be derived from an automatic stay by participating, without a reservation of its rights, in a "proceeding against the debtor." While Rule 11–44(b) expressly states that the stay shall continue until the case is closed, dismissed, or converted, none of which applies to Townview, this Rule must be read in conjunction with Bankr. Rule 610. Rule 610 empowers:

"(t)he trustee or receiver (to), with or without court approval, prosecute or enter his appearance and defend any pending action or proceeding by or against the bankrupt, or commence and prosecute any action or proceeding in behalf of the estate, before any tribunal."

Since Rule 610 empowers a trustee and, so, a Debtor-in-possession, to defend against pending actions or proceedings against the bankrupt and, by inference, against proceedings which normally would be subject to Rule 11–44's automatic stay, we view Rule 610 to empower a trustee or Debtor-in-Possession, among other things, to waive the protections afforded by Rule 11–44.

(iii) *The Thirty-Day Rule*

■ Since Townview should have foreseen the consequences of failing to litigate its defenses in the administrative proceeding before the Department of Health, de-

14. We agree with the majority of courts who find *In re Hillsdale Foundry Company, supra,* 2 Collier Bankr.Cas. 546, to be bad law.

faults under the 30-day rule imposed by 10 N.Y.C.R.R. Sec. 86.8(e) (repealed) may collaterally be estopped (or be res judicata) in this bankruptcy proceeding. And, there was a default of some sort in the administrative proceeding before the Department of Health, for Rule 11-44's automatic stay did not toll the 30-day rule. Townview waived whatever rights it may have had under Rule 11-44 as to the administrative proceeding against it by responding within 30 days to a majority of the audit items. But, we do not think that Townview's failure to reply to 54 of the audit results, when it timely replied to a majority of the audit, should preclude reply as to these 54 items in this proceeding. Our conclusion follows not as an application of either the preclusion doctrines or the automatic stay provisions but, rather, as a matter of regulatory interpretation.

Section 86.8(e) of 10 N.Y.C.R.R. provides that "the audit report shall be final unless . . . the medical facility initiates a bureau review of such final audit report. . ." The effect of the State's argument would be to rewrite this regulation to read, instead, that "the individual items of an audit report severally shall be final unless . . . the medical facility initiates bureau review of each such audit item of an audit report." Section 86.8(e)'s 30-day rule should not be read so narrowly and to such harsh ends. We view reply to an audit's results within the 30-day period as a pleading in the nature of an answer. (We view the Department's notification of the final results of its audit as a pleading in the nature of a complaint). As such, it may be amended. See New York State Administrative Procedure Act Sec. 302 (McKinney's 1981). Cf. New York Civil Practice Law and Rules Section 3025 (McKinney's 1982).

b. *The Schimmel Adjustment: An Audit Adjustment Posing Only the Question of the Proper Method of Accounting For an Unexplained Surplus in the Partners' Capital Account*

 Arnold Schimmel, ("Schimmel"), Townview's outside accountant, discovered a $28,330.00 surplus in the partners' capital account. He and the State's auditor, Nathan Breslau, ("Breslau"), concluded that the best explanation for the surplus was that there had been an overstatement of expenses. Breslau and Schimmel agreed to make a compensating entry over three years in the category of employee health and welfare benefits. See Breslau at 32–41, 219, 220, 335, 358.[15] Townview argues that Breslau does not know whether the surplus was created in 1970 or in earlier years. This uncertainty and the possibility that the overstated surplus resulted from an overstatement of liabilities and not expenses lead Townview to conclude that the Schimmel adjustment is arbitrary. Moreover, contends the debtor, the State's own work papers state that the surplus resulted from an overstatement of liabilities and not expenses.

Townview has not "set forth specific facts showing that there is a genuine issue for trial," Fed.Rule Civ.Proc. 56(e), and, on this basis, we grant New York's Motion for Summary Judgment as to this audit item. Instead of specific facts showing that the surplus relates to periods preceding 1970–1973, Townview merely alleges that "the auditor could not and does not know whether the alleged surplus was created during 1970 or prior thereto." This allegation alone does not raise a material issue of genuine fact. Similarly, the mere allegation, by Townview, that "the debtor is prepared to prove at trial that such a surplus can be created by other means such as a settlement of liabilities," Memorandum of Law in Opposition to Motion for Summary Judgment at 14, does not raise a material issue of genuine fact. Nor are we convinced that the fact that a surplus *might* have been created by some means other than an overstatement to expenses rises to the level of "substantial evidence."

Finally, Townview alleges that the State's own workpapers belie a conclusion different than that asserted by Schimmel

---

**15.** This notation indicates the relevant pages in the deposition of Nathan Breslau.

and relied upon by Breslau. We need not decide whether such an inconsistency amounts to "substantial evidence" of the audit's incorrectness, for the workpaper Townview refers to is not contained within the record before this Court. Moreover, even if the workpaper could be found and entered as evidence at some later trial, its usefulness as evidence is severely hampered by the fact that Breslau, and so we presume no other State employee, admits to having prepared the workpaper. *See* Breslau at 356–360. Fed.Rule Evid.Rule 803(5) and (6).

c. *The Failure of Townview to Document*

(i) *Its Failure to Present Sufficient Financial Records For a Determination of Costs Payable Under Medicaid Program*

Federal regulations require a provider to maintain financial records sufficient for the determination of costs payable under the Medicaid program. 42 CRF 405, 406(a); 42 CFR 405, 453(a) and (c); HIM–15 § 2304.[16] State regulations impose similar requirements. 10 N.Y.C.R.R. §§ 86.3(a) and 86.-8(a) (repealed).

In the following audit adjustments, Townview failed to produce records establishing that service was rendered or expense incurred; 1970 audit item # 23, depreciation of abandoned equipment, *see* Breslau at 176–183; 1970 audit item # 10, telephone expenses, *see* Breslau at 82–90; 1973 audit item # 10, dues to medical association, *see* Breslau at 377; 1971 audit items # # 26 and 27; 1972 audit items # # 7(a) and (b); 1973 audit items # # 21 and 28, compensation claimed for Lucille Feldman and Judith Goldsmith, *see* Breslau at 292–

298, 316–325, 390–391; 1970 audit items # # 2, 26, 27, 1971 audit items # # 3, 28, 29, 1972 audit items # # 3 and 8(b), 1973 audit items # # 24 and 30, salary, social security and unemployment insurance claimed for Ernest Murphy, *see* Breslau at 41–43, 206–207, 220–221, 297, 298, 304, 391, 392; 1971 audit item # 25, 1972 audit item # 6, 1973 audit item # 26, compensation claimed for Robert Mancus, *see* Breslau at 286–292, 297–298, 315–316, 389–391; 1970 audit # 25, 1971 audit # 24, 1972 audit item # 5, 1973 audit item # 25, compensation claimed for Morris Goldsmith, *see* Breslau at 197–200, 205–206, 314–315, 389–391.

Townview first argues, generally, that documentation of costs payable under the Medicaid program is unavailable because "the nursing home was seriously vandalized resulting in a loss of property to the estate as well as a loss of records." Memorandum of Law in Opposition to Motion for Summary Judgment at 2. To this, the State replies: "[t]he audit reports and deposition of Nathan Breslau state clearly that the records in question were not available during the course of the audit which was completed prior to Townview's closing on December 15, 1975. The first New York City Police Department report (Complaint No. 15925) of a burglary involving records indicates that the incident occurred between December 13 and 15. (A prior incident, on December 9 and 10, reported in Complaint No. 15593, involved only the loss of an adding machines and typewriters.) The only fire at Townview, according to New York City Fire Department records for December 1975 and January 1976, took place on January 5, 1976. Memorandum in Support of Motion for Summary Judgment at 20.

---

**16.** These federal regulations apply to the Medicare, 42 U.S.C. §§ 1395, et seq., (1982), program. However, 10 N.Y.C.R.R. § 86.21 (repealed) incorporates "the principles of reimbursement" developed for determining payments under the title XVIII (Medicare) program.

Medicare Provider Reimbursement Manuals, abbreviated HIM, are manuals published on a yearly basis by the Department of Health and Human Services (formerly, the Department of Health, Education and Welfare). These Manuals, like New York's Codes, Rules and Regulations, appear in a loose leaf service. As old Manual provisions are replaced with new ones, the older versions are thrown out. We apply Manuals applicable to the period 1970–1973, however, and, as we did with New York's Regulations, we work from these replacement manuals and historical notes appended to them.

Despite this seeming factual disagreement (the parties failed to provide any affidavits in support of their contentions), we find no genuine factual issue to exist here for Townview admits at page 1 of its Memorandum in Opposition to Motion for Summary Judgment, that the vandalism it complains of occurred "[d]uring the period between the audit and the service of the same." Under this circumstance, Townview's argument that vandalism and fire destroyed documents necessary to sustain its burden of proof carries no weight, for the purpose for the requirement to maintain documents is so that an audit meaningfully can be performed. Townview's excuse does not explain why documents did not exist at the time of the audit.

 As to 1970 audit item # 23, depreciation of abandoned equipment, Townview argues that the documentation existed at the time the HE–2 Report was filed; a certified public accountant who prepared the HE–2 Report verified that such documentation existed at the time he filed that Report. State regulations, 10 N.Y.C.R.R. § 86.8(a) (repealed), require a medical facility to retain "all underlying books, records and documentation which formed the basis for the fiscal and financial reports" for no less than 6 years after the filing of those reports. That the documents existed at the time the HE–2 Report was is irrelevant, unless Townview can corroborate the contents of those documents through other evidence.

As to 1970 audit item # 10, telephone expenses, Townview similarly argues that Breslau admitted, in his deposition, that invoices for these expenses were attached to the HE–2 Report. *See* Breslau at 88. But, on the next page, Breslau corrected himself, saying "these [expenses] were included, and the charge that was made as reimburseable expense of the HE–2, *but there were no invoices for them furnished to me.*" Breslau at 89. Townview also contends that Breslau, in his deposition, admitted that the State does not always require 100% verification of expenses. *See* Breslau at 89. But Breslau applies this "rule of reason" to Townview's documents, saying:

> "It's a matter of reason. Some items we will accept as being reasonable, but in this particular case, there were invoices which I believed were not for the nursing home, for the operation and care of patients. That's just my belief.
>
> Q What led you to that belief?
>
> A The consistent absence of invoices, for one thing. . .
>
> Q I am on item ten. That is not the case with item ten.
>
> A Item number ten invoices were missing. That's it."

Breslau at 90.

 As to 1970 audit items # # 2, 26 and 27, 1971 audit items # # 3, 28 and 29, 1972 audit items # # 3 and 8(b), 1973 audit items # # 24 and 30, salary, social security and unemployment insurance claimed for Ernest Murphy, Townview concedes that it lacks time sheets, but argues that the affidavit of Ernest Murphy, appended to Memorandum in Opposition to Motion for Summary Judgment, and Morris Goldsmith's deposition together meet regulatory requirements. New York replies that Ernest Murphy's affidavit is deficient, because it does not specify the number of hours per week which Murphy worked. They also argue that Goldsmith's testimony is self-serving.

The Murphy Affidavit explains the fact that time sheets are unavailable for Ernest Murphy to this Court's satisfaction. Murphy, described as a functional illiterate, states in his affidavit:

> "I was asked not to use the time clock, because I made mistakes and spoiled other people's cards. I tried to keep a sign-in book of my time, but then I was told that I was doing that wrong also. Then they told me that the Nursing Director, Mrs. Ramdass, would check me in and out each day that I came because her office was in the lobby. After she died, I continued to work my same part-time schedule."

Morris Goldsmith corroborated this state of affairs in his deposition. Goldsmith at 32–44.[17] While Goldsmith testified that he did not know how many hours Ernest Murphy worked a week, he did remember that Murphy worked two or three days a week. Breslau disallowed Murphy's salary in its entirety, explaining, in his audit report: "An examination of the time cards and sign-in records, did not substantiate that Mr. Murphy was present at the Townview Nursing Home or that he performed any services therein." Exhibits A, B, C and D appended to Memorandum of Law in Support of Motion for Summary Judgment. We find that Townview has raised a material issue of fact as to whether Ernest Murphy worked at Townview during the periods 1970–1973. How many hours per week Mr. Murphy worked at the nursing home during that period need not be established in this Motion, but rather is a subject for proof at the hearing.

The Murphy Affidavit also explains the social security and unemployment insurance claimed for Ernest Murphy. He states in his affidavit:

> "I always worked part-time and was never a member of the union... Since I never received union welfare benefits, during those times when I became sick and unable to work, I was kept on the payroll, and it was explained to me that this was a form of sick leave, due to my long years with the home, when I had never received sick days, vacation, holidays or other paid time off."

Breslau disallowed these amounts, in their entirety, because he had disallowed Murphy's salary. *See* Exhibits A, B, C and D appended to Memorandum of Law in Support of Motion for Summary Judgment. We find that Townview has raised a material issue of fact as to whether social security and unemployment insurance actually was paid to Ernest Murphy, during the period in which allegedly he was employed by Townview on a part-time basis.

As to 1971 audit items # # 26 and 27, 1972 audit items # # 7(a) and (b), 1973

audit items # # 21 and 28, compensation claimed for Lucille Feldman and Judith Goldsmith, 1971 audit item # 25, 1972 audit item # 6, 1973 audit item # 26, compensation claimed for Robert Mancus, and 1970 audit item # 25, 1971 audit item # 24, 1972 audit item # 5, 1973 audit item # 25, compensation claimed for Morris Goldsmith. Townview argues that, as to Morris Goldsmith's compensation, the relevant ledger was given to the State and never returned, and, as to all of the audit items listed above, Breslau arbitrarily estimated compensable hours for some, but not all, of these employees of the nursing home. The State replies that the fact that a relevant ledger was given to it is a matter within the personal knowledge of Paul Parawan, a former employee of Townview, and that no Parawan Affidavit appears within the record. As to Lucille Feldman, Judith Goldsmith and Robert Mancus, New York maintains that no sign-in sheets were available at the time of the audit.

Fed.Civ.Proc. Rule 56(e) provides, in relevant part, as follows:

> "(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

These requirements are mandatory. 10 Wright and Miller, Federal Practice and Procedure § 2738 (1982). As a general rule, hearsay is not admissible as evidence. Fed. Rule Evid. Rule 802. The Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Morris Goldsmith testified, in his deposition, as follows:

> "Q Did you give the sign-in book to the Office of the Special Prosecutor or did you give it to somebody else?

---

**17.** This notation indicates references to Morris Goldsmith's deposition.

A I didn't give it. Paul Parawan stated, on no uncertain terms to while we were looking through the book that he gave it to Mr. Osner (phoenetic) the auditor at Townview.

Q When was that period?

A During Eisner's auditing. There were two auditors and they came and went. Some were there for two weeks, some were there for three weeks and they would come back and forth. At one period that Mr. Eisner was there, he was given a sign-in book.

Q After the audit was conducted in 1974 or '75, excuse me, 1975, you did not have the sign-in book?

A It was not returned.

Q It was not returned to you?

A That's right.

Goldsmith at 130–131.

While Goldsmith's statement that Parawan told him that he had given the ledger to Eisner is hearsay if used to prove that Parawan actually gave the ledger to Eisner, his statement is not hearsay if the fact that Parawan said such a thing to Goldsmith is used as circumstantial evidence that Parawan gave the ledger to Eisner.

Goldsmith's statement is sufficient, moreover, to meet the standards of Fed.Rule Civ.Proc. 56(f). That statute provides, as follows:

"(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained..."

The Second Circuit, in *Contemporary Mission, Inc. v. U.S. Postal Service,* 648 F.2d 97, 107 (2d Cir.1981), held that "Rule 56(f) cannot be relied upon to defeat a summary judgment motion 'where the result of a continuance to obtain further information would be wholly speculative.' 6 Moore, Federal Practice ¶ 56.24 at 56–1428. *See First National Bank v. Cities Service Co.,* 391 U.S. 253, 293–294 [88 S.Ct. 1575, 1594–1595, 20 L.Ed.2d 569] (1968)."

We do not find the circumstantial evidence represented by Goldsmith's deposition to be "wholly speculative." That a ledger exists is a matter within Goldsmith's personal knowledge; as to the ledger's existance, Goldsmith testified:

"Q Did you ever sign in when you were reporting for work in 1970?

A Always."

Goldsmith at 129. Accordingly, we deny the State's Motion for Summary Judgment as to those audit items involving the undocumented number of hours worked by Morris Goldsmith.

In Addition, Townview set forth specific facts showing a genuine issue for trial. Breslau did not wholly disallow Goldsmith's compensation, even though the sign-in book was not made available to him. Instead, he observed Goldsmith in 1975 and compared his observations with those of an unnamed auditor who had made similar observations in 1971. On the basis of these observations, he concluded that "Mr. Goldsmith's attendance averaged 2 days per week for 5 hours per day or an average of 10 hours per week." *See* Exhibits A, B, C and D appended to Memorandum of Law in Support of Motion for Summary Judgment. Goldsmith testified, in his deposition, that he worked an average of 15 to 20 hours per week during the period 1970 to 1973, a matter within his personal knowledge. Goldsmith at 129.

New York contends, and apparently this argument applies both to the Murphy affidavit and Goldsmith testimony, that "under the Medicaid regulations, the only way Townview could raise a genuine issue of fact concerning the audit adjustments ... would be to produce the required documents. Anything less, as a matter of law, is not substantial evidence." We disagree with the State's interpretation of regulations pertaining to documentation requirements, as a matter of law.

Federal regulations require "providers receiving payment on the basis of reimburseable cost" to provide "financial records and statistical data." 42 CFR §§ 405.406(a)

and .453(a). Manuals published by the Department of Health and Human Services explain the Department's interpretation of these federal regulations as follows:

"Cost information, as developed by the provider, must be current, accurate, and in sufficient detail to support payments made for services rendered to beneficiaries. This includes all ledgers, books, records, and original evidence of cost (purchase requisition, purchase orders, vouchers, requisitions for materials, inventories, labor time cards, payrolls, bases for apportioning costs, etc.) which pertain to the determination of reasonable cost, capable of being audited."

HIM–15 § 2304.

These documentation requirements, however, correspond to the documentation required to be presented upon audit. As such, the audit of Townview properly disallowed compensation for employees for whom there was no documentation.

Our task in reviewing the results of this audit is not as easy as that of the accountant in performing the original audit. Our job is to determine whether a medical facility has shown substantial evidence that the audit items are incorrect. 10 N.Y.C.R.R. § 86.8(f)(3) (repealed). This regulation does not define substantial evidence and we view prior, judicially derived definitions of this standard of evidence as applicable. Neither those judicially created definitions, nor the applicable New York regulation, superimpose the federal, pre-audit documentation requirements upon this standard of evidence. We, therefore, conclude that evidence of the number of hours worked other than ledgers or labor time cards, such as a witness' testimony, is admissible to establish the incorrectness of an audit item. With what weight this evidence is to be viewed is a question whose answer must await the discretionary determination of a trial judge.

Townview also argues that Breslau acted arbitrarily when he estimated the number of hours per week Goldsmith worked at the nursing home, but did not estimate the number of hours per week

Judith Goldsmith and Lucille Feldman worked for the nursing home. Breslau did not estimate the number of hours Judith Goldsmith and Lucille Feldman worked, because, unlike Morris Goldsmith, Breslau was given time sheets for both employees. The time sheets provided that, in 1971, Lucille Feldman worked 370 and ½ hours and Judith Goldsmith worked 143 and ½ hours. The time sheets for 1972 indicated that Judith Goldsmith worked 4 and ½ hours, while Lucille Feldman did not work at the facility. In 1973, the time sheets indicated that neither Lucille Feldman nor Judith Goldsmith worked at the facility. *See* Exhibits B, C and D appended to Memorandum in Support of Motion for Summary Judgment. When Breslau was asked, in his deposition, why he estimated the number of hours Morris Goldsmith worked, but did not estimate the number of hours Judith Goldsmith or Lucille Feldman worked, he replied,

"... where there was no sign-in book, [the answer I made] was made from other information, my personal observation, whereas the allowance I made where there was a sign-in book was done on the basis of the sign-in book."

Breslau at 391.

Townview raises no facts from which we may infer substantial evidence of the incorrectness of these audit items. In fact, Morris Goldsmith's testimony largely corroborated Breslau's assumption that blank time-sheets for Lucille Feldman and Judith Goldsmith generally meant that the women had not worked. Both women were not employed by Townview as such; they instead were viewed as special consultants who were paid for the number of hours worked. Neither worked at the nursing home on a regular basis. *See* Goldsmith at 152–153, 154–155. Both women were required to sign in. Goldsmith further testified that the women made it a habit to sign in.

"Q Did Lucille Feldman sign in every day that she reported to work?

A It was my belief that she did.

Q She was required to sign in, then?

A That was her general habit, to sign in. She could have missed. She certainly never was there less than the amount she signed in but she could have been there more than the time she signed in. She could have missed signing in, I don't know, I didn't check on her.

\* \* \* \* \* \*

Q ... [D]id Judith Goldsmith sign in and out?

A Yes."

Goldsmith at 152–153, 154.

Finally, Townview argues that Breslau acted arbitrarily when he estimated the number of hours per week Robert Mancus worked at the nursing home based upon information given to him by Paul Parawan, an employee of Townview who had not worked there when Mancus had. Mancus died prior to the time Breslau conducted the audit. When Breslau inquired as to the time records of Mancus' employment, he was told that Mancus and Goldsmith both signed in the now missing ledger. Breslau estimated the number of hours Mancus worked per week for Townview during the period 1970–1973 and did so on the basis of several sources: a fellow auditor who audited Townview during that period and observed personally Mancus' work hours at that time, and employees, including Parawan, employed by Townview while Breslau conducted the audit. Since Breslau relied upon another auditor's observations made in 1971 and employees of Townview who likely were employed there between 1970–1973, we see no basis for questioning Breslau's conclusion.

(ii) *Its Failure to Present Sufficient Documentation That Charges Were Related to Patient Care*

Federal regulations limit payments to providers of services to the "reasonable cost of services" which "includes all necessary and proper costs incurred in rendering the services." 42 CRF § 405.451(a). Necessary and proper costs are "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." 42 CFR § 405.-451(b)(2). *See* HIM § 2102.2. State regulations impose similar limitations: 10 N.Y. C.R.R. § 86.21(e) (repealed) provides that, in order to be considered as allowable costs in determining reimbursement rates, "costs must be properly chargeable to necessary patient care;" 10 N.Y.C.R.R. § 86.21(e) (repealed) provides that "allowable costs shall not include expenses or portions of expenses reported by individual facilities which are ... not reasonably related to the efficient production of service because of either the nature or amount of the particular item."

New York asserts that

"[t]he relationship of expenses to patient care is an essential element of a provider's claim for reimbursement, and, like other essential elements, it must be documented. At the very least, the 'original evidences of cost' should name the facility as the purchaser. There should be an indication that delivery, where appropriate, was made to the facility, or that the work was done at the facility. The item purchased and the location of the vendor must be reasonable—e.g., the purchase of bedpans from a supplier near the facility raises no questions, but television service furnished by a company located nearly forty miles and in close proximity to the operating partner's personal residence is unacceptable on its face."

Memorandum of Law in Support of Motion for Summary Judgment at 22.

We decline to read federal and state regulations limiting reimburseable costs to necessary and proper or reasonably related costs as a rule of evidence. State regulations governing the evidence admissable at such as hearing as this, 10 N.Y.C.R.R. § 88.-8(f)(3) (repealed), "substantial evidence that the items therein contained are incorrect," does not incorporate the federal or state regulations which limit allowable costs.

We agree with New York, however, when it urges this Court, in the alternative, that the applicable test "would be whether it is reasonable to infer that the expenses were related to patient care." Memorandum of Law in Support of Motion for Summary

Judgment at 23. Townview must rebut the correctness of audit items with substantial evidence. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See* n. 9, *supra*, at page 443.

In the following audit items, New York contends that the expenses were unrelated to patient care: 1971 audit items # # 11 and 13, cost of newspapers and magazines delivered to Morris Goldsmith's private home, *see* Breslau at 90–93, 237; 1971 audit item # 12, 1972 audit item # 12, 1973 audit item # 12, telephone bills for telephones located in Morris Goldsmith's private home, *see* Breslau at 229–237, 377–378; 1970 audit item # 13, 1971 audit item # 14, costs of supplies purchased near Morris Goldsmith's private home, *see* Breslau at 95–99, 237–238; 1970 audit items # # 3, 4, 5 and 6, 1972 audit items # # 4, 5, 6 and 7, 1972 audit items # # 9, 10 and 19, 1973 audit items # # 4, 5(a) and 14, automobile expenses, *see* Breslau at 51–61, 221–223, 326–327, 353–354, 371–372; 1973 audit item # 13, charges to employee convention expense, *see* Breslau at 378–380; 1970 audit item # 19, 1971 audit item # 18, 1972 audit item # 13, 1973 audit item # 15(b)(c), travel expenses, *see* Breslau at 120–124, 141–142, 245, 247–253, 332–335, 380–383; 1970 audit item # 18, 1971 audit item # 18, Nursing Home Ass'n. dues, *see* Breslau at 118–120, 244–247, 250–253.

■ As to 1970 audit items # # 3, 4, 5 and 6, 1972 audit items # # 4, 5, 6 and 7, 1972 audit items # # 9, 10 and 19, 1973 audit items # # 4, 5(a) and 14, automobile expenses, Townview argues that Morris Goldsmith established, at this deposition, that Townview's partners used the three cars [18] for Townview related business and that the auditor's allowance of mileage instead of actual cost was an arbitrary act. To this the State replies that Goldsmith's testimony did not establish the number of miles attributed to Townview business in his own car and did not have personal knowledge regarding the type of use made by other partners of their cars. We agree

with New York. *See* Goldsmith at 46–51. As to the auditor's decision to allow mileage instead of the actual cost of these cars, it was not arbitrary. *Westhampton Nursing Home v. Whalen,* 67 App.Div.2d 1017, 413 N.Y.S.2d 244 (1979).

■ As to 1970 audit item # 19, 1971 audit item # 18, 1972 audit item # 13, 1973 audit items # # 15(b) and (c), travel expenses, Townview argues that Morris Goldsmith established that these expenses were related to patient care—were necessary or helpful to the operation of the nursing home—and that Breslau admitted in his deposition that these expenses may have been incurred *to the benefit of the nursing home.* Goldsmith described generally that these expenses were incurred in travels to conventions given by the Nursing Home Association, an association in which he served as an officer at various times. We agree with the State when it argues that this testimony does not establish the necessary relationship. We also note that the portion of the Breslau deposition to which Townview refers is quoted out of context. The entire quote is as follows:

"I do not deny it might have been of use to the Townview Nursing Home, but considering that all of these organizations that are mentioned had large numbers of members, the percentage that would benefit the Townview Nursing Home was small, and it was not revealed to me as to what benefit was applicable."

Moreover, 10 N.Y.C.R.R. § 86.21(h) (repealed) provides that:

"[a]llowable costs shall not include costs which principally afford diversion, entertainment or amusement to their owners, operators or employees."

While 10 N.Y.C.R.R. § 86.21 (repealed) allows "the cost of educational activities ... provided such activities are directly related to patient care services," Townview has alleged no facts from which we might infer substantial evidence that these conventions directly related to patient care or that they were not primarily for Goldsmith's entertainment.

Goldsmith at 46.

---

**18.** All three of these cars were Cadillacs.

■ As to 1970 audit item # 18, 1971 audit item # 18, Nursing Home Ass'n. dues, Townview argues that these items clearly inured to the benefit of the nursing home's patients. This allegation alone does not set forth specific facts showing that a genuine issue for trial exists. Moreover, 10 N.Y.C.R.R. § 36.21(1) (repealed) specifically limits the allowability of such dues to that amount which appears on the audit results.

■ As to 1971 audit items # # 11 and 13, cost of newspapers and magazines delivered to Goldsmith home, Townview argues that Breslau's determination that the periodicals and newspapers were unrelated to patient care was arbitrary because based upon a conversation with only one Townview employee, Parawan, who had not been an employee of Townview in 1971. Townview also argues that the testimony of Morris Goldsmith establishes the requisite relationship to patient care.

Goldsmith only testified with respect to the newspapers delivered to his home and not the periodicals. As to the newspaper subscriptions, he testified that the newspapers were brought to Townview by his wife, Judith Goldsmith, not every day, but whenever she went to work at the nursing home. The State contends that this fact alone negates any possible relationship between the newspapers and patient care. We disagree, but find that Goldsmith's testimony negates the necessary relationship.

Goldsmith testified that the newspapers were used by his wife "in order to conduct recreation activities . . . during that period when she was part of the recreation department and ran programs." Goldsmith at 78. He also testified that he daily read the papers. Considering that Goldsmith testified that he read the paper every day, but that Judith Goldsmith did not bring in the papers every day (nor could he recall whether she brought in all of the papers when she went to Townview), we find that the newspapers "principally afforded diversion, entertainment and amusement to" Goldsmith and his wife. 10 N.Y.C.R.R. § 86.21(h) (repealed).

■ As to 1971 audit item # 12, 1972 audit item # 12, 1973 audit item # 12, telephone bills for telephones located in Morris Goldsmith's personal home, Townview argues that the testimony of Goldsmith establishes the relationship between these phones and patient care at Townview. Goldsmith testified that he maintained two phones in his home. On one phone he was billed for long distance phone calls at a reduced rate. One phone substantially was used for business purposes, but since it offered the reduced long distance rates, he infrequently used it for personal business as well. When asked how he allocated telephone bills related to personal and to business purposes, he responded:

"It was done generally on the basis of an analysis of the amount of calls being used. If I used very little on a phone in that month I wouldn't bother bringing the bill in [to Townview accountant]. If I used more, I would bring it in. I tried to balance it out, depending upon my own usage."

Goldsmith at 69–70.

Goldsmith's accountant later verified these estimates. After Goldsmith obtained a telephone credit charge card, which allowed Goldsmith to identify his business calls with greater accuracy, Goldsmith's accountant was able to determine the two lists. Also, when Townview closed in 1975, he compared the decreased phone bills with those incurred in 1970 and 1971, in order to confirm these estimates.

Goldsmith's testimony is sufficient to establish a relationship between telephone expenses and patient care, for his recollection of his accountant's methods of estimation and verification rebuts the auditor's presumption that all telephone calls made from any phone located at Goldsmith's personal home. We, of course, need not comment upon the weight which this or any other trial court might give to such testimony.

■ As to 1970 audit items # # 12 and 13, 1971 audit items # 14, costs of supplies purchased near Morris Goldsmith's private home, Townview argues that Morris Goldsmith's testimony establishes the necessary

relationship to patient care. Included within these items were the cost of a table top, wallpaper hanging, camera, shelves, teak desk, cabinet and shelves carpentry, TV service and garden supplies. Goldsmith only testified with respect to the wallpaper hanging, table top and camera. As to the wallpaper hanging, Goldsmith only was able to testify that the paper had been hung at Townview, but could not recall on which wall it had been hung. Goldsmith at 80–83. This testimony, without more, is insufficient to establish any relationship between the cost of wallpaper and patient care. Fed.Rule Civ.Proc. 56(e). As to the camera supplies, Goldsmith was unable to recall what supplies were purchased for the $147.00 bill disallowed by the 1970 audit. Instead, Goldsmith testified:

"A I assume $147.00 is a total, not a single item, or numberous items. They could be $3.00, $8.00, $4.00 items.

Q Did you often purchase things from White's Camera Company Massapequa?

A What is often?

Q More than five times a year?

A I'd say approximately five times a year. In addition, I would throw parties and for activities I would use White's to buy and develop pictures, buying film and developing pictures."

Goldsmith at 86.

We find that this testimony, while not as precise as it might have been had not the period between purchase of these items and audit of their costs amounted to more than six years, sufficiently raises facts showing that there is a genuine issue for trial. As to the table top, Goldsmith testified:

"It was used to repair a table that we had legs for that was broken and it was used in the dining recreation room at Townview and also some shelves and closets... It was a conference table where people would sit around and play games, arts and crafts, so it might have been twelve feet long by three and a half or something like that, across, maybe fourteen feet long. It was a long table used for recreation."

Goldsmith at 89. Again, we find the requisite relationship sufficiently to have been established.

Breslau disallowed these items because he presumed there to be no relationship between goods purchased near Goldsmith's home and patient care received at Townview. We find this presumption to rest upon spurious ground and sufficiently to have been rebutted by Goldsmith. When asked to explain why supplies were purchased in Long Island, where Goldsmith's private home was located, instead of New York City, where Townview was located, Goldsmith responded:

"Q Why did you choose a company in Massapequa?

A Because it was convenient. That's where I live. If I was going to buy a gift on my time, I buy it where I can get it and not have to pay for parking.

Q So it was a common practice to pick up the items that you ordered from certain vendors which you didn't deal with on a regular basis rather than have them delivered to Townview?

A Yes, because it cost more to deliver than the items."

Goldsmith at 88.

We are satisfied with Goldsmith's explanation.

### d. *An Application of Federal and State Regulations*

New York contends that the following adjustments pose only the question of application of the relevant Medicaid regulation: 1973 audit item # 3, reversal of accrued salaries, *see* Breslau at 369–371; 1970 audit items # # 8 and 9, 1971 audit items # # 9 and 10, 1972 audit item # 15, 1973 audit item # 22, reduction of allowed food costs for failure to offset income from soda and food vending machines against expenses, *see* Breslau at 67–72, 74–80, 225–228, 339–341, 388–389; 1970 audit item # 25, 1971 audit item # 24, 1972 audit item # 5, 1973 audit item # 25, compensation paid to Morris Goldsmith in excess of ceiling for administrative salaries; 1971 audit items # # 25, 26 and 27, 1972 audit items # # 6, 7(a) and

(b), 1973 audit items # # 21, 23 and 26, *see* Breslau at 289–297, 316–321, 393; 1970 audit item # 15, 1971 audit item # 17, 1972 audit item # 8(a), 1973 audit item # 8, cost of health insurance for Morris and Judith Goldsmith, *see* Breslau at 104–107, 244, 374–375; 1970 audit item # 14, charge for patient slacks and drycleaning of slacks, *see* Breslau at 101–104, 99–102; 1970 audit item # 17, fire and boiler insurance; 1971 audit item # 7, charges for barber and beautician services for patients, *see* Breslau at 65–67; and Schedules B and C to 1970–1973 audits, leasehold improvements and movable equipment.

■ As to 1973 audit item # 3, salary audits, New York argues that Townview's own records indicate that these salaries had not been paid between 1970–1973. Federal regulations limit reimburseable costs to "costs incurred." 42 CFR 405.451(a). The State urges this Court to adopt a definition of "costs incurred" meaning "costs paid." We decline.

While the regulation itself does not define the phrase "costs incurred," the phrase has a fixed legal meaning.

> "A debt has been incurred when liability attaches; a contingency promise to pay has been incurred when the contingency upon which the payment depends occurs."

*Stuyvesant Insurance Co. of New York v. Nardelli,* 286 F.2d 600, 603 (5th Cir.1961), *quoting, Maryland Casualty Co. v. Thomas,* 289 S.W.2d 652, 655 (Tex.Civ.App.1956).[19] A "cost incurred" is, thus, a "cost accrued" and not necessarily a "cost paid."

■ There remains an issue of fact, however, as to these accrued salaries, for Breslau, in his deposition, indicates that some of the accrued salaries were disallowed because settled. Other accrued salaries were increased. *See* Breslau at 370. To the extent that liability no longer attached to these accrued salaries, disallowal was proper, for no cost had been incurred.

■ As to 1970 audit items # # 8 and 9, audit items # # 9 and 10, 1972 audit item # 15, 1973 audit item # 22, reduction of allowed food costs for a failure to offset income from soda and food vending machines against expenses, Townview argues that Morris Goldsmith testified that the money was put into a petty cash fund. *See* Goldsmith at 54–58. That coins from these vending machines were put into a petty cash fund is not a matter of dispute, however, and would, in fact, support the State's audit result. State regulations, 10 N.Y.C.R.R. § 86.22 (repealed), require "operating costs [to be] reduced by the costs of services and activities which are not properly chargeable to patient care, [or in the alternative,] the income derived therefrom substituted for costs of these services and activities [and similarly deducted]." Since Townview does not set forth facts to support a contention that soda and food vending machines were related to patient care, we agree that income from these machines should have been offset against operating costs.

■ As to 1970 audit item # 25, 1971 audit items # # 24, 25, 26 and 27, 1972 audit items # # 5, 6 and 7(a) and (b), 1973 audit items # # 21, 23, 25 and 26, the partners' compensation and health insurance, Townview questions the legal basis for the State's disallowances. Each disallowance rests upon an application of regulatory ceilings upon administrative salaries and the salaries of owners and their relatives. We agree with the State's interpretation and application of these regulatory ceilings.

State regulations establish ceilings on payments for certain reimburseable costs.

---

19. While this case involved the interpretation of an insurance contract, similar definitions arise in other contexts: *United States v. St. Paul Mercury Indemnity Co.,* 238 F.2d 594 (8th Cir.1956) (interpretation of National Service Life Insurance, 38 U.S.C. §§ 701, et seq.); *Desoto Securities Co. v. Commissioner of Internal Revenue,* 235 F.2d 409 (7th Cir.1956) (interpretation of 26 U.S.C. § 505(a)(1)'s language 'paid of accrued'; comparison to other statutory provisions with 'paid or incurred' language); *Quarles Petroleum Co., Inc. v. United States,* 551 F.2d 1201, 1205 (Ct.Cl.1977); *Williams v. St. Clair,* 610 F.2d 1244, 1248 (5th Cir.1980) (interpreting Social Security Insurance statute).

10 N.Y.C.R.R. § 86.14 (repealed). Tables of maximum rates for allowed administrative salaries are promulgated by the Department of Health. For a nursing home of Townview's size, the relevant ceiling roughly equalled $43,000, in gross, or $24,800 for an individual administrator. *See* Breslau at 254–283. Since Townview employed two administrators, the gross ceiling applied to Townview.

Federal and State regulations also establish ceilings paid to owners and relatives of owners. 42 CFR § 405.426 and HIM–15 § 902.5 limit compensation to owners and relatives to reasonable amounts. Criteria for determining reasonableness can be found in HIM–15 §§ 902, 904 and 905. Regulations promulgated by the Department of Health set the salary of owners or relatives of owners who hold aide positions to $7,500 per year (or $3.60 per hour) for the period between 1970 and 1973.

These maximum amounts include the cost of health insurance. *See* HIM–15 §§ 906.1 and 902.5 (personal insurance for owners and relatives included in compensation for purposes of applying ceilings). Since both Morris and Judith Goldsmith had exceeded their maximum allowed amounts, these insurance amounts were disallowed. Health insurance provided to non-working partners was disallowed as contrary to federal regulations. 42 CFR § 426 (compensation for owners and relatives of owners permitted only for services rendered.)

Townview argues that Judith Goldsmith and Lucille Feldman worked as Recreational Therapists for Townview and should not be limited to maximum salaries applicable to owners or relatives of owners holding aide positions. We agree with New York, however, when it contends that the question of either Judith Goldsmith or Lucille Feldman's qualifications is irrelevant. The Health Department set a ceiling of $7,500 per year as salary of owners or relatives of owners. Two exceptions exist—owner or relative serving as administrator or director of nursing—but neither of those exceptions applies here.

As to the audit items contained in Schedules B and C, appended to the 1970, 1971, 1972 and 1973 audit reports, *see* Exhibits A, B, C and D appended to Memorandum of Law in Support of Motion for Summary Judgment, Townview questions the legal basis for the State's disallowances. Disallowances in Schedules B and C rest upon an interpretation and application of HIM–15 §§ 108.1 and 108.2 (guidelines for capitalization of historical costs and improvement costs of depreciable assets). HIM–15 § 108.1 provides as follows:

"If a depreciable asset has at the time of its acquisition an estimated useful life of at least 2 years and a historical cost of at least $150, its cost must be capitalized, and written off ratably over the estimated useful life of the asset, using one of the approved methods of depreciation..."

Townview argues that the movable equipment, listed in Schedule B, improperly was capitalized because: (i) no distinction is made between new and used equipment; (ii) individual assets, the price for which is less than the $150 floor imposed by HIM–15 § 108.1, were grouped so that the aggregate sum exceeded this minimum amount; and (iii) useful lives of movable equipment were extrapolated beyond December of 1975, the date on which Townview closed.

██ We need not address Townview's first contention, because it does not allege that any of the movable equipment listed in Schedule B was purchased used. Townview's second contention merits discussion, however. Prior to revision by Trans. No. 104 (issued Dec. 1974), which added §§ 108.1 and 108.2 to the Provider Reimbursement Manual (abbreviated HIM), § 108 reads as follows:

"Realistic standards must be set by providers in establishing the cost and useful lives of depreciable assets purchased which will be capitalized. For example, the policy of a particular provider may be to capitalize all depreciable asset expenditures of $50.00 or more when the asset has an estimated useful life of three years or longer, while asset expenditures

of less than $50 would be charged to expense. The standards so established must be followed consistently. Irrespective of the policy established, depreciable assets costing $100 or more must be capitalized. *Where an asset is purchased in quantity so that the cost of the quantity exceeds $200 the cost of the individual items must be capitalized.*"

(emphasis added.)

Breslau testified, at his deposition, that he aggregated expenses in Schedule B pursuant to generally accepted accounting practices. *See* Breslau at 159. We find that this practice, however generally accepted by accountants in other, unrelated fields, conflicts with federal regulations.

▮▮▮ Townview's argument that the "estimated useful life" of certain of its movable equipment should have been modified by the auditor in light of the fact that the nursing home closed in 1975 also merits discussion. HIM–15 § 108.1 does not define "estimated useful life," but we assume that the phrase is borrowed from depreciation deduction and capitalization provisions of the Internal Revenue Code, 26 U.S.C. §§ 167 and 263 (1982). Regulations promulgated by the Commissioner of Internal Revenue under these statutes define estimated useful life as "the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." Treas.Reg. § 1.167(a)–1(b) (1960). This regulation continues:

"The estimated useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination."

A question of fact exists as to whether there existed a significant change in the useful life of the movable equipment listed in Schedule B. A word of caution remains, however, for the useful life of movable equipment need not necessarily have been effected by the closing of Townview. Closing would significantly change the useful life of equipment for which no other nursing home or business could find a use. But the useful life of equipment does not cease simply because its prior owner ceases to have a use for it; the useful life of equipment runs for as long as that equipment is useful to any business or individual.

HIM–15 § 108.2 provides as follows:

"Betterments and improvements extend the life or increase the productivity of an asset as opposed to repairs and maintenance which either restore the asset to, or maintain it at, its normal or expected service life. Repair and maintenance costs are always allowed in the current accounting period.

With respect to the costs of betterments and improvements, the guidelines established in § 108.1 must be followed, i.e., if the cost of a betterment or improvement to an asset is $150 or more and the estimated useful life of the asset is extended beyond its original estimated useful life by at least 2 years, or if the productivity of the asset is *increased significantly* over its original productivity, then this cost must be capitalized and written off ratably over the remaining estimated useful life of the asset, as modified by the betterment or improvement. As in the previous section, lower minimum criteria may be used if desired."

Townview urges us to find Morris Goldsmith's testimony to establish that the leasehold improvements made to Townview did not significantly increase its productivity. We need not reach this determination, for we agree with New York's interpretation of HIM–15 § 108.2 when it argues that repairs exceeding $150 presumptively increased the life of an asset. Here, leasehold improvements far exceeded this $150 minimum. An auditor is required, under HIM–15 § 108.2, both to inquire as to the cost of a betterment or improvement *and* whether the estimated useful life of the asset was increased by two years or more beyond its

original estimated useful life by such expenditures. But the audit results presumptively are correct, unless Townview can raise facts from which we might infer substantial evidence of its incorrectness. Townview does not allege (in the proper form of an affidavit) that these improvements did not extend the useful life of its leasehold by less than two years.

As to 1970 audit item # 14, dry cleaning and clothing purchase, 1970 audit item # 17, fire and boiler insurance, and 1971 audit item # 7, barber and beautician charges, we deny the State's motion for summary judgment, without prejudice, for we have not been able to locate the regulations about which the parties disagree.

The fire and boiler insurance audit item concerns interpretation of regulations which include property expenses as imputed rent. Townview contends that these regulations were not promulgated until 1974. If, indeed, these regulations were not promulgated until 1974, then the propriety of disallowances based upon them depend upon whether retroactive application was intended and is proper.[20]

Both the barber and dry cleaning audit items involve regulations requiring certain expenses to be charged from a patient's personal allowance. Townview contends that this regulation was not applicable during the period 1970–1973. (The regulation which New York cites must contain a typographical error.)

e. *Other Audit Items*

Several audit items remain undiscussed and we turn to them now. In the 1970 audit results, item # 20, real estate taxes, the auditor disallowed a portion of this expense on the basis of a financing statement (referred to as the Lumobel Financing Statement). Townview argues (i) that the 1971 financing statement was an improper basis for 1970 tax information and (ii) that a financing statement, no matter the year prepared, should not have been relied upon instead of the original tax bills.

■ Townview's first argument is without merit. Breslau testified, in his deposition, that the 1971 financing statement reported the previous year's tax payments. *See* Breslau at 148. Similarly, its second contention becomes unpersuasive when viewed in light of Breslau's testimony: his worksheets indicated to him that he had seen the actual tax bills. *See* Breslau at 149–150.

As to 1973 audit item # 1, credit for union's health and welfare benefits, Townview argues that (i) that the auditor admittedly took a double deduction for this amount and (ii) that the 1971 and 1972 audits should reflect this amount, and not, as it does, the 1973 audit. Townview's basis for its first argument, Breslau's deposition, does not stand up to scrutiny, however, for that document only establishes the confusion of Townview's counsel and not Breslau. *See* Breslau at 363. Its second argument is equally unmeritorious when viewed in light of the actual audit results, as they make the disallowances in the order Townview suggests they should have been made. *Compare* 1973 audit item # 1 *with* 1971 audit item # 2 and 1972 audit item # 2.

■ Finally, Townview disparages the qualifications of the State's auditor, asserting that Breslau is not a Certified Public Accountant. *See* Breslau at 6. We find no

**20.** New York refers this Court to 10 N.Y.C.R.R. § 730. No such section exists, but we assume that the State refers us to 10 N.Y.C.R.R. § 703.1, et seq. (1975). If so, Townview is correct when it contends that that regulation was not applicable until after the period audited. The statute became effective on April 11, 1975. Even if the regulation applied here, it would not require barber and beautician charges to come from individual accounts. While 10 N.Y.C.R.R. § 730.2(h)(8) requires a residential health care facility to provide, *inter*

*alia*, "materials for ... care of hair," and 10 N.Y.C.R.R. § 730.3(f) requires such facilities to provide individual patient accounts, neither regulation identifies what charges are to come from these patient accounts or who is required to pay for the "care of hair." Townview is not required to provide slacks under 10 N.Y.C.R.R. § 730.2, however, we think that Morris Goldsmith's testimony evinces facts from which substantial evidence of the incorrectness of the relevant audit item can be inferred.

fault to this failing in Breslau. While state regulations require that a medical facility's financial and statistical reports be certified by an independent licensed or certified public accountant, 10 N.Y.C.R.R. § 86.6 (repealed), no reciprocal requirements exist for the state's audit results.

Settle an order in conformity with the foregoing.